POLAR STAR LODGE No. 1 *v.* POLAR STAR LODGE No. 1.

It is not within the power of the majority of the members of a corporation to dissolve it as long as a sufficient number of members to represent and continue the corporation exists.

The want of a resolution of this corporation to authorize the institution of a suit in their name can only be taken advantage of by pleading it as an exception, *in limine litis.*

A resolution passed by a majority of the members of a corporation authorizing a donation of the property of the corporation to a new corporation, in which the members so voting are corporators, is unauthorized, and a donation made in pursuance of it will be void.

APPEAL from the Third District Court of New Orleans, *Duvigneaud,* J. *J. L. Tissot, J. Q. A. Fellows* and *E. Filleul,* for plaintiff and appellant. *P. Soulé* and *C. Dufour,* for defendant.

The counsel for plaintiff argue as follows :

On the 19th February, 1855, the Grand Lodge of the State of Louisiana granted a charter of incorporation to the Polar Star Lodge No. One.

The acts of the Legislature in corporating the Grand Lodge, approved 18th March, 1816, and 11th February, 1819, provide : "That all the regular lodges, which shall be constituted by the Grand Lodge, are hereby declared to be bodies corporate and politic, in name and in deed, by whatever style or name they may be called and known in their constitution, with equal powers to those which are given to the Grand Lodge by the said act, so long as the said lodges shall remain under the power and jurisdiction of the said Grand Lodge, and in all things abide by and conform themselves to the resolutions and by-laws of the same, and no longer."

After its incorporation by the Grand Lodge, the Polar Star Lodge acquired, by an act of donation of the 3d March, 1855, the property described in the plaintiff's petition.

For the purpose of this controversy, the counsel for the plaintiff deem it unnecessary to refer to matters that took place before the incorporation of the Polar Star Lodge, as evidenced by their charter marked J, and dated 19th February, 1855, the plaintiff and defendant claiming the litigated property by a common title.

The voluminous books and documents of the different corporations which have existed in by-gone times, and from which sprung and grew the Polar Star Lodge No. One, the plaintiff, are offered in evidence ; they may satisfy the curiosity of the Court, or perhaps throw some light upon certain facts which, without this assistance, might remain obscure.

But for the purpose of this controversy, it is sufficient to begin at the date of the charter J, on the 19th February, 1855. By this incorporation the Polar Star Lodge No. One became, to use the expressson of the act of the legislature of 11th February, 1819, "*a body corporate and politic*" *with equal powers to those which are granted to the Grand Lodge,* to wit ; *to take, hold and enjoy real and personal property ; to sue, to defend and also to receive, take and apply bequests · or donations that may be made to and for the uses intended by the said institution,*" act of 1816, approved 15th March. And inasmuch as the Polar Star Lodge No. One could only enjoy these privileges through the Grand Lodge, the Polar Star Lodge was subject to the jurisdiction and the *visitorial* power of the Grand Lodge, its founder.

The donation of the 3d March, 1855, was made to the Polar Star Lodge No. One, *for the uses intended by its institution*, to-wit: for Masonic purposes and Masonic charities; and for such purposes was the property used until the 15th January, 1858.

On the 15th January, 1858, the Polar Star Lodge No. One was composed of the same members who are now arrayed against each other as members of the two hostile corporations, the plaintiff and defendant in this suit.

On that day, a meeting of the corporation took place.

This meeting was held in the name and under the jurisdiction *et sous les auspices* of the Grand Lodge.

Le Vénérable Maître, annonce qu'il a fait convoquer extraordinairement, à la demande de plusieurs membres de cet atelier, qui avaient à présenter un plan qu'ils jugeaient utile et nécessaire pour arriver à pouvoir payer les billets qui sont dûs à la Très Illustre Grande Loge, et il offre alors la parole à ce sujet."

The Court may judge of the truth of these words, by examining the summons to the members. We transcribe it here literatim.

" Orient de la Nouvelle Orléans, 14 janvier, 1858.

Très cher frère,—vous êtes prévenu qu'une séance extraordinaire aura lieu vendredi prochain, 15 du courant à 7 heures du soir, pour une importante affaire qui sera traitée avant la séance de famille."

Par mandement,

[Signed]          L. GLOECKNER, Secretary.

The members present having been invited to offer their views *on the subject matter now before the meeting*, to-wit: How to procure the means to pay the notes due to the Grand Lodge :

" Le frère D. Michel expose en quelques mots, que plusieurs membres de cet atelier sont prêts à avancer la somme nécessaire au paiement des billets échus de la Grande Loge, pourvu que cette avance leur soit légalement garantie. Il pense qu'un acte d'incorporation est le meilleur moyen de garantie de ce prêt, et il donne lecture de l'acte qui suit :" Here is copied *verbatim in toto*, in the minutes, the act of incorporation of Polar Star Lodge No. 1, the defendant, of the 14th January, 1858, copied in the Rec. as Doc. M. p. 88 to 92.

Immediately after the reading of this document, Brother Michel offers the following preambles and resolutions which I copy *verbatim* from the minutes, without changing an *iota*.

" Considérant que la majorité des membres de cette Loge s'est fait incorporer conformément aux loix de cet Etat, sous le nom de la Loge de l'Etoile Polaire No. Un ;

" Considérant que cette Loge, dans cette tenue extraordinaire, régulièrement convoquée, a approuvé cette mesure, après mûre délibération, et a accepté ledit acte d'incorporation comme utile et nécessaire :

" Il est résolu, que le vénérable maître, R. Brugier, et à son défaut ou absence, que le frère H. Deron, soit autorisé, invité et requis de faire un acte de transfert et de donation, de toutes les propriétés de cette loge, à cette dite corporation la loge l'Etoile Polaire No· Un. Ledit transfert et ladite donation sujets à toutes les hypthèques et dettes qui seront assumées par ladite corporation, sans exception ni réserve, afin que ladite corporation puisse se *servir et disposer de ses propriétés en vue d'objets charitables et maçonniques*."

" Le frère Levasseur n'ayant *pas bien entendu*, le frère Michel relit une seconde fois cette proposition."

These resolutions were then put to the vote; the following members protested and refused to vote : F. Levasseur, Ch. Claiborne, J. L. Tissot, Otto Schwaner, M. Meilleur, Pierre Devergès.

The resolutions were carried by the majority, and accordingly the president, the next day, before Lisbony, notary public, executed the act of donation of the 16th January, by which all the property, movable and immovable of the Polar Star Lodge No. 1, was taken from the corporation, and transferred to the defendant.

At the next meeting, always *sous les auspices de la Très Illustre Grande Loge*, on the 22d January, 1858, the act of donation passed on the 16th January, 1858, was read, approved, and ordered to be spread on the minutes. Of the members present, 17 members voted in the affirmative ; 4 voted negatively, to-wit, J. L. Tissot, Oct. Schwaner, P. Devergès, F. Levasseur ; and three members left the room before the vote and opposed the measure, to-wit : Michel Meilleur, F. A. Lumsden and Ch. Claiborne. A motion was then made and carried by the majority, that the Secretary do inform the absent members, of the action of the Lodge, inviting them to join the new incorporation and to sign their names.

.   Another motion is made and adopted in the following words :

" Résolu que le frère Collon sera chargé de retirer les billets dûs à la Grande Loge."

See minutes, sitting of the 22d January, p. 241.   Brother Collon never paid a cent to the Grand Lodge and never withdrew the notes from the Grand Lodge. At the next sitting of the 4th February, 1858, brother Michel moved the following resolutions, which were adopted over the protest of Meilleur, Devergès, Schwaner, Texier and Levasseur.

1o. " Il est résolu, que la respectable Loge l'Etoile Polaire No. Un se retire, quoiqu'à regret, de la jurisdiction de la Grande Loge de l'Etat de la Louisiane.

2o. "Le Trésorier de la respectable Loge est invité à régler d'une manière définitive avec la Grande Loge.

3o.  " Le Secrétaire de la respectable Loge est invité à communiquer officiellement les présentes résolutions à la Très Illustre Grande Loge de l'Etat de la Louisiane."

And on the 16th February, 1858, the Secretary Gloeckner surrendered the charter of the Polar Star Lodge to the Grand Lodge, after having written across the charter the following words :

" This Charter has been cancelled and surrendered according to the resolution by which the M∴ W∴ Lodge Polar Star No. One withdrew itself from the jurisdiction of the Grand Lodge of the State of Louisiana.

New Orleans, 16th February, 1858

[Signed]                    L. GLOECKNER, Secretary."

The Court have now before them a naked and correct statement of the acts and doings of the seceding majority of the members of Polar Star Lodge No. One ; they know also the history and creation of Polar Star Lodge No. 1, the defendants, and how the defendants acquired their wealth ; we will soon examine the questions of law which are raised by the acts of the defendants, and the acts of the persons which the defendants are bound to defend.  But before examining the

P. Star Lodge
v.
P. Star Lodge.

law, let us complete the history of this case, by placing before the Court the acts of the minority of the corporation of the Polar Star Lodge No. One, after the secession of the majority and their erection into a new corporation.

The seceding members had, no doubt, a right to cease to be members of the corporation; they have made so complete an abandonment of the corporation, and such a resignation of their interest, in the charter, in declaring the dissolution of Polar Star Lodge, that their acts amount to an express declaration that they would serve no longer as members of the corporation, and they must be bound by their declarations and considered and treated as not being members of the corporation any longer.

But if it was in the power of the seceding members to abandon the corporation, it was not in their power either to dispose of the property of the corporation, or to destroy the charter of the corporation.

The corporation, therefore, still existed, with all their rights, privileges and franchises unimpaired, and the members remaining faithful to the charter and contract of incorporation, were the only members of the corporation of Polar Star Lodge No. 1, and they alone formed and continued the same corporation.

It becomes, therefore, greatly necessary to lay with correctness before the Court all the proceedings done by the Polar Star Lodge No. 1, the plaintiff.

The majority of the Lodge having donated the property which was the domicil of the corporation, on the 16th of January, 1858, and having ordered the surrender of the charter, and resolved the dissolution of the corporation on the 4th February, 1858; the members of Polar Star Lodge No. 1 who differed from the majority were then deprived of a domicil and of the possession of the charter.

Looking to their charter as a guide in their present difficulties, they addressed a petition to the Grand Lodge, who had erected them into a corporation, and who by the terms of their charter, had a regulating and visitorial power over the corporate bodies of its creation, they laid their grievances before its visitorial tribunal.—See Doc. 2, R. p. 124 to 129, and Minutes of plaintiff marked P in that memorial. After having related all the acts of the majority, and the resolutions passed by them, they add :

" That the undersigned denied the power of said majority to pass said resolutions, and refused to vote for them, and protested against the same; and when said resolution had been so adopted, the 'undersigned did declare that said lodge had not thereby ceased to exist; more than the necessary number of master masons of said lodge were still remaining true to their allegiance, and claimed that they were, and still did constitute the said lodge, and were proprietors of the charter, and did demand delivery of the same, which was refused, and they thereupon protesting withdrew, etc.

" And the undersigned represent to you M∴ W∴ Sir and Brother, that said attempted cession is void in law, a palpable fraud on their rights, and an attempt to plunder them of their interest in said property.

" That by said resolutions of withdrawal from the jurisdiction of the Grand Lodge, the said conspirators simply over-reached themselves, and withdrew from said lodge, which they could not so destroy or dissolve; that the undersigned and F. A. Lumsden, A. R. Morel, P. A. Lanaux, E. Tallarie, E. de St. Romes and L. A. Genry, are now the only legal remaining members of said lodge; that by said vote, R. Brugier, L. E. Deluzain, H. Clostermann, J. Lasalle, A. Colin, J. Colon, L. Gloeckner, D. Michel, J. Mouras, J. Jauquet, L. G. Fabio, J. Vedot, J. Turpia, P. Van Rooten, A. Denis, H. Deron, L. Nieberger, F. Ecrot, C. Du-

pré and E. Aynaud have ceased to be members thereof, and are in revolt against the Grand Lodge; that said lodge yet exists, and is entitled to be represented in the present session of the Grand Lodge.

" They, therefore, pray to be recognised as Polar Star Lodge No. 1, under the jurisdiction of the Grand Lodge of Louisiana; and as *said charter* is illegally withheld from them, *they request you to cause to be delivered to them a duplicate or exemplification* thereof, that they may at once meet as a lodge, *elect their officers* in place of those who have resigned as aforesaid, and be immediately represented in the present Grand Lodge, where they will pray that M∴ W∴ Body to aid them in the adoption of such legal measures as will annul the said fraudulent and pretended act of cession, restore to them the possession of said property, &c., &c.

(Signed)     P. Devergès,     M. Meilleur,
J. L. Tissot,     A. Texier,
Chs. Claiborne,     Otto Schwaner,
F. Levasseur."

This memorial was referred by the Grand Lodge to their committee of general purposes, appeals and grievances, who recommended in their report the following resolutions, which were adopted on the 9th February, 1858 :

1o. " Resolved, that the charter of Polar Star Lodge No. One be entrusted to brothers P. Devergès, M. Meilleur, J. L. Tissot, A. Texier, Chs. Claiborne, F. Levasseur, O. Schwaner and F. A. Lumsden, and such other members of Polar Star Lodge, not otherwise named in the foregoing report, who shall give their allegiance to this Grand Lodge and who shall be received by said eight brethren just named, with power at once to proceed organising their lodge, by the election and installation of officers ; and be entitled to be represented herein, so soon as they shall have done the same, and in default of *obtaining the charter of said Lodge* for such purpose, a certified copy of this resolution shall be their warrant, until such time as a regular charter can be furnished them."

2o. " Resolved, that the lodge, as composed by the first resolution, are hereby authorised to try and punish in the manner pointed out in the constitution, all the other members of said lodge."

The remaining members of Polar Star Lodge, after having obtained this decree of the Grand Lodge, followed strictly the directions of their charter ; it was their duty, according to the words of said charter, " to transact all matters relating to masonry according to the ancient usages and customs of Masons." They were also " required to attend the Grand Lodge, at its regular communications and other meetings, by their Masters and Wardens, or by proxies regularly appointed," and the secession of their members having deprived them of their officers, they proceeded to the election of their officers, and afterwards presented the following petition to the Grand Lodge, to have their new officers accredited by the Grand Lodge.

The undersigned, duly organized by virtue of your decree, signed this day, and granting to them the charter, which belongs to them, ever faithful members of Polar Star Lodge No. One, under the jurisdiction of this Grand Lodge, having proceeded to the election of their officers, give hereby notice of the same, to-wit :

*A. R. Morel,* Worshipful Master, *Chs. Claiborne,* Senior Warden, *F. Levasseur,* Junior Warden, *P. Devergès,* Orator, *M. Meilleur,* Secretary, *A. Texier,* Treasurer, *Otto Shwaner,* Master of Ceremony, *J. L. Tissot,* Sword Bearer, *C. Samory,* Hospitaler, *E. E. Tallarie,* Expert, *M. Prados,* Inside Tyler.

And said members of Polar Star Lodge No. One, being now ready for installation, do request your most Worshipful Body, to be kind enough, to delegate a deputy, in order to perform the ceremony, so that they may be represented at this Grand Communication.

Signed, A. R. Morel, W. M.,

M. Meilleur, Secretary.

The Grand Lodge granted the prayer, and appointed the Deputy Grand Master *Amos Adams*, to perform the duty of installation, and the following Brethren were admitted in the Grand Communication of the Grand Lodge as representatives of Polar Star Lodge No. One :

*Ach. R. Morel*, W∴ Master, *Chas. Claiborne*, Sr. Warden, *F. Levasseur*, Jr. Warden.

On the 17th February, 1858, the Secretary of the Grand Lodge delivered to the plaintiff the charter J. The charter J is the charter of the 19th February, 1855, and is now, and has always been the charter of plaintiffs.

The plaintiffs continued and are now continuing as a corporation, as it is shown by their minutes and testimony of *Morel* and *Devergès*.

Five bills of exception were taken on the trial of this case, to-wit : one bill of exception to the opinion of the Judge, refusing to receive in evidence the documents 1, 2, 3 and 4 of record, p, 143.

This bill of exception falls to the ground, because, by consent, the same documents were acted upon, and considered by the court as being in evidence. The same documents are also introduced in evidence and found in the book of minutes marked P and in the book U, being the proceedings of the Grand Lodge for the year 1858.

The other four bills of exception are submitted to the consideration of the court.

As to the question of damages suffered by the plaintiffs, the witness *Morel*, says, that the building can be rented from $2,000 to $2,500 a year.

*Devergès*, another witness, says that the property can be rented from $1,500 to $2,000 a year.

*A. P. Lanaux* is of opinion, that the property can be rented from $200 to $250 a month.

Here we close the statement of facts of this case as shown by record, and the court can ascertain its accuracy by comparison with the record and the documents sent in original.

The counsel for plaintiff will now examine the questions of law which arise from the facts and are presented to the court for their decision.

1st. Were all the forms complied with, the meeting duly summoned, and *bona fide* held at the sittings of the Corporation Polar Star Lodge No. One, of the 15th and 22d January, and 4th February, 1858 ?

2d. Can the majority of the corporation, under the charter J granted by the Grand Lodge on the 19th February, 1855, erect themselves into the new corporation of the 14th January, 1858, under the same name, and dispose of the property of the corporation in favor of themselves, and destroy the Charter J, which was confided to them, and thereby disfranchise the other members?

3d. Is the act of incorporation of the 14th January, 1858, valid? was the corporation fully organized and capable of receiving and accepting the donation of

the 16th January, 1858 ? and does the act of donation create a trust for purposes foreign to the institution of the said corporation ?

4th. Can the majority of the corporation secede? and what is the effect of their secession as regards the remaining members, and the rights and property of the corporation ?

First question.—Were all the forms complied with, the meeting duly summoned and *bona fide* held, at the sittings of the corporation of Polar Star Lodge No. One, of the 15th and 22d January, and 4th February, 1858 ?

The summons for the meeting of the 15th January, 1858, is dated the 14th January, 1858 ; it does not state the nature of the business to be transacted at the meeting. It is not issued by order of any person having authority to assemble the corporation. Angel & Ames, on corporations, Nos. 489, 491, 494 ; Grant, on corporations, 157.

It has not been served on *P. A. Lanaux*, one of the members; the notice has not been given a reasonable time before the hour of meeting. Angel & Ames, No. 494.

The proceedings were not fairly conducted ; the minutes of the meeting show clearly, that there existed a conspiracy between certain members to destroy the charter of the corporation, and to dispose of its property. The clandestine and unfair manœuvres of the majority are clearly shown by the minutes of the 15th January, 1858.

The president informs the members, that he has assembled the Lodge at the request of several members, who wished to offer a plan, of their own, to pay the debt due by the Lodge to the Grand Lodge.

The Grand Lodge was not urging the payment of its claim, and never intended nor manifested the intention of enforcing the payment of its claim. This was then a mere pretence.

Brother *Michel* immediately proposed to make a donation of the property of the Lodge to the corporation created on the 14th January, 1858, composed of the majority of the Lodge. And for what purpose is this donation to be made ? It is certainly not to pay the Grand Lodge,—payment has not yet been tendered to the Grand Lodge.

But the object of the donation is clearly expressed in the resolution of Brother *Michel*—the purpose was, to get rid of the obligations of the Charter, and to have a free use and disposal of the property :

" *A fin que ladite corporation puisse se servir et disposer de ses propriétés, en vue d'objets charitables et maçonniques.*"

Some members had been kept in the dark, and in total ignorance, about the measures taken by the movers, and, at the sitting of the 22d January, 1858, a resolution was passed, requesting the secretary to inform the ignorant Brethren of the acts of the meeting of the 15th January. This circular is as follows :

### ETOILE POLAIRE No. 1, RITE ECOSSAIS.

O∴ de la Nouvelle-Orléans, le 23 Janvier, 1858.

T∴ C∴ F∴

" Je suis chargé de vous informer officiellement des transactions qui viennent d'être faites dans notre Loge.

" Dans une séance extraordinaire, à laquelle vous avez été régulièrement convoqué, et qui a eu lieu vendredi, 15 du courant, la majorité des membres actifs de l'atelier a, sur motion secondée, décidé qu'une vente authentique serait faite

P. Star Lodge
v.
P. Star Lodge.

et signée par notre Vénérable Maître, en sa qualité de représentant légal de l'atelier, au profit et en faveur de la corporation connue sous le nom de "*Loge l'Etoile Polaire No. 1, Société Charitable d'Assistance et de Secours Mutuel*"; cette corporation étant formée de tous les membres actifs de notre Loge.

"Cette donation a été faite par devant notaire, et la Loge, dans sa séance de vendredi, 22 du courant, l'a sanctionnée.

"Les deux actes qui constatent cette transaction sont : 1o., l'acte d'incorporation, et, 2o, l'acte de donation. Ils ont été déposés aux archives de la Loge ; et dans le cas où vous n'auriez pas assisté aux séances où ils ont été lus, vous êtes prié de venir en prendre connaissance.

"La Loge a également passé une résolution par laquelle vous êtes invité à adhérer à l'acte d'incorporation et à le signer.

"Dans cet espoir, j'ai la faveur de vous saluer.

P∴ L∴ N∴ M∴ Q∴ V∴ S∴ C∴

"Par mandement.

[Seal]

L. GLOEKNER,
*Secrétaire.*"

This document shows, that the measures taken by the movers were clandestine and the result of a conspiracy of certain members. It proves : that the donation was not made to a Masonic Lodge for Masonic purposes, as alleged in the pleadings, but to the "*Loge l'Etoile Polaire No. 1, Société Charitable d'Assistance et de Secours Mutuel,*" and it asserts an untruth in saying "*cette corporation étant formée de tous les membres actifs de cette Loge.*" The opposition of certain members, appearing of record, on the minutes of the corporation at the meeting of the 22d January, a resolution is adopted, which still shows clearly the bad intention of those who concocted these schemes : "Il est résolu que le frère *Collon* sera chargé de retirer les billets dûs à la Grande Loge."

How to explain this and how to qualify such acts?

No appropriation is made and no money is furnished to Brother *Collon*, wherewith to pay the notes due the Grand Lodge, and the Polar Star Lodge has divested itself of all its property, nothing having been reserved, not a farthing, to pay the Grand Lodge. Can we not, under such circumstances, say that this resolution was passed with the intention of deceiving somebody ; and afterwards, as a consequence of the two sittings of the 15th and 22d January, 1858, the resolution is adopted in the sitting of the 4th February, 1858, to withdraw from the jurisdiction of the Grand Lodge, and to cancel the charter of incorporation.

This short *exposé* shows that the proceedings of the corporation, in their sittings of the 15th and 22d January, and 4th February, 1858, were not conducted *bona fide*, and regularly, and that all the required legal formalities were not fulfilled, and that the acts of the corporation growing out of these proceedings, are null and void.

Second question. Can the majority of the corporation, under the charter J granted by the Grand Lodge on the 19th February, 1855, erect themselves into the new corporation of the 14th January, 1858, under the same name, and dispose of the property of the corporation in favor of themselves, gratuitously and absolutely, and destroy the Charter J which was confided to them, and thereby disfranchise the other members by the annihilation of the corporation?

In order to ascertain the powers of a corporation, we must look to its charter. Grant, on corporations, No. 13.

A charter of incorporation is the written instrument by which the crown institutes the body politic, and conveys to it its peculiar *Constitution*, its rights, privileges, *powers*, &c., imposes a name upon the corporation, *defines its objects and purposes*, and assigns such conditions and limitations upon the exercise of the powers, privileges, &c. conferred, as the crown seems fit, &c.

*No corporation can pursue any other objects than those specified in its charter. There alone, can the peculiar purposes of its establishment be discovered. This principle will be found of the utmost importance for the solution of various questions respecting the law of corporations, and specially of trading corporations.* Grant, No. 13.

The modern doctrine, says Kent, is to consider corporations as having such powers as are specifically *granted by the act of incorporation*, or as are necessary for the purpose of carrying into effect the powers expressly granted, and as not having any other. Kent's Commentaries, vol. II, p. 364, p. 279, 299 ; 3 An. 19.

Under these guides, let us test the acts of the corporation by these principles. Was it for the purpose of carrying into effect the powers granted by the act of incorporation of 19th February, 1855, that the majority erected themselves into a new corporation under the same name, on the 14th January, 1858, and made the donation to themselves ? The answer is readily made : No ! This scheme was devised to destroy the charter, and the powers therein contained ; and, therefore, the corporation could not perform such an act ; the act was hostile to the object of the incorporation, and the members could not bind themselves for purposes foreign or hostile to those for which they are established. Kent, vol. II, p. 365.

The act of the majority binds the corporation and the minority, only when it is consonant to, and not in contravention of the *purposes of the incorporation.* The erection of the new corporation, and the donation of the property, were certainly made for the purpose of destroying the corporation, and the majority were powerless to destroy the corporation. Here are the principles of the best writers on corporation law. Grant says : subject to the restriction that the will of the majority *be consonant to, and not in contravention of the purposes of the incorporation*, the will of the majority binds the whole body, such will being in all cases collected at a *corporate assembly duly constituted*, and not from the aggregate of the *assents of the* corporators, obtained separately and apart, for that would not be a corporate act. Grant, 69.

But where it is desired to defray a charge which is not legally binding, there the assent of all is requisite. Grant, 70.

Those who vote for an object which it is not within their competence to vote for, effectually are in law considered not to be present or taking part in the meeting. Grant, 71.

" Mais remarquons-le bien, ce droit de la *majorité* d'obliger la *minorité* n'existe que pour les affaires de l'administration ; son omnipotence ne va pas jusqu'à pouvoir changer les *conventions primitives* sur lesquelles s'appuie l'existence même de la société. Ici, la résistance *d'un seul* des associés *suffit* pour rendre inutiles les projets de la majorité. Il faut rester dans les termes du contrat, ou se dissoudre ; *l'unanimité peut* SEULE altérer les conditions constitutives de la société et substituer, en quelque sorte, un contrat à un autre contrat. La raison dit, en effet, qu'on ne peut déroger aux clauses d'un contrat que par *l'unanimité* des contractants." Troplong, Contrat de la société, v. 2, p. 213, No. 724.

But this right of the majority must be strictly confined to acts done within the scope of the business of the partnership, and does not extend to the right to

change any of the articles thereof. In effecting such a change, it is essential that all should unite, otherwise it is not obligatory upon them. Collyer, Partnership, No. 198; Story, Partnership, No. 123.

But although all the forms be duly complied with, and no objection be alleged, either on the ground of the meeting not having been duly summoned, or not having been held in the proper place, or the votes not having been properly taken, although in short every thing has been done in the most regular manner as regards forms, yet a resolution or corporate act having for its object to destroy the existing constitution of the corporation, is, in the common law courts, if effected, as far as the form of affixing the common seal goes, regarded as *null and void, being beyond the competency of the corporation.* Grant, 157, 158.

But although at common law, the acts of the *majority* bind 'the *minority*, in all cases, within the constitution of the body politic; yet equity will give relief to a corporation where its interests have been fraudulently dealt with by those who at the time represented the corporation, although the whole of them assented to the act complained of, &c., Id., No. 71.

For the corporation is a metaphysical being, not identical with the majority or even the *aggregate of its members at any given time, but consisting of them, their predecessors and successors,* and has rights altogether distinct and separate from those of all or each of such majority or aggregate body, and here, the thing done was contrary to and in violation of the *constitution of the corporation;* and it has been laid down, that if a transaction be *void* and not merely *voidable,* the corporation cannot confirm it, so as to bind the dissenting minority of its members. Hence, it would seem to follow, that if after an *illegal act* were done in the name of the corporation, by a party having for the time the management of the affairs of the corporation, the custody of the corporate seal, &c., so that an action could not be brought in the name 'of the corporation, without their acquiescence, yet, that if afterwards, the then minority were to become *the managing body,* they might commence an action *in the name of the corporation,* and recover damages against the guilty parties. Grant, 72.

*Held:* That the charter having limited the power of those who had the affixing of the common seal, by *conditions which were inconsistent with the notion* of applying the common seal, for the purpose of procuring the *annihilation* of the society, and the common law containing no principle allowing the interest *constituted in the funds of the corporation to be taken away without the consent of the whole body,* an injunction must issue to restrain from affixing the common seal until the hearing. Grant, 73.

The result of the above authorities, therefore, is, that acting within *the scope and in obedience to the provisions* of the constitution of the corporation, the will of the majority, duly expressed at a legally constituted *assembly, must govern;* but beyond the limits of their constitution, neither *the will of the majority* nor *unanimity* can make an act valid. Grant, 73 and 291.

According to the principles which govern corporations, it seems that there cannot be two corporations of the same name at the same time. Grant, on corporations, p. 61, No. 50.

In the Pandectes of Pothier, we find that one person could not be at once member of two corporations; in such a case, the person was bound to make his election and to abandon one of the corporations.

*Non licet autem, amplius quàm unam collegium licitum habere, ut est constitu-*

*tum, et à divis fratribus, rescriptum est, eligere, eum oportere, in quo magis esse velit.*"  Pothier, Pandectes, liv. 47, tit. 22.

Il faut que celui qui veut être un des membres d'un corps ou communauté, ne soit pas un des membres d'un autre, qui peut avoir des droits et des intérêts opposés à ceux de la communauté où il voudrait entrer, ou dont les délibérations dussent être inconnues à d'autres, par de justes causes.  Ainsi, celui qui exercerait deux métiers, ne pourrait être des deux corps de l'un et de l'autre.  Domat, vol. III, p. 249, No. 7.

The two corporations which are parties to the act of donation, of the 16th January, are certainly two distinct corporations, two distinct *intellectual persons* performing different and antagonistic acts, as donors and donees.

The purposes of their incorporation are different; the one is instituted for masonic purposes only, the other is a " *Société Charitable d'Assistance et de Secours Mutuels,*" or, according to its English charter, *a charitable society of relief and mutual support,* for their own use and convenience, and for the sole purpose of absorbing the former corporation.

It has no power to *convene as masons and to perform masonic duties* according to its charter, and cannot have any other powers but those granted by the charter.  Kent, vol. II, p. 301, Quoted Supra.

But the title of the Polar Star Lodge No. One, to the property described in the petition, is restricted and limited to certain uses, and the stipulations of the title cannot be disregarded.

The act of donation of the 3d March, 1855, before E. Lareche, Notary Public, to be found in the record, contains this clause :

" Il est expressément entendu et convenu, que cette donation, étant faite à une *société, loge,* ou *corporation maçonnique,* chacun desdits donnataires ne pourra posséder et ne possédera lesdites propriétés mobilières et immobilières, ensemble avec ses co-associés, qu'autant qu'il restera et demeurera membre de ladite société, loge ou corporation maçonnique, conformément aux lois, *usages et statuts de la maçonnerie,* et aussi conformément aux règles de ladite société, loge ou corporation maçonnique, &c."

It is clear, that the Polar Star Lodge No. One holds the property for masonic uses and purposes, and can make no valid alienation and defeat the conditions of its title.

The act of donation of the 16th January, 1858, before *J. Lisbony,* is an absolute donation, without any restriction ; the only condition and restriction annexed, is to pay the debts due by the donor.

The defendants have brought their minutes into court, to prove that they are organized as a masonic lodge ; but it is not in their minutes, where we must look for their powers and obligations, to act as masons ; it is in the charter, which is the depository of their authority ; and that instrument, not granting to them the power to act as masons, we say boldly, that they have no such power and that they can cease to act as masons, according to their will and caprice, and sell the property, and pocket the money and divide it between themselves, without violating the obligations of their charter.

It is self-evident, that the majority had not authority to dispose of the property of the Polar Star Lodge under the title of the corporation.

Without these restrictions the donation would still be null under Article 427, Civil Code.

This article says, the estate and rights of a corporation belong so completely

to the body, that none of the individuals who compose it can dispose of any part of them.

" It appears then, that landed property coming to corporations, by whatever means, vests in the invisible and metaphysical entity, the members of the corporation having no individual interests in the land of the corporation, and being to the same extent as any strangers, trespassers, if they go upon the land without due authority from the corporation." Grant, No. 128.

Now all lands granted to a corporation, by charter, are granted to be held to them and their successors ; in other words (as it would seem) to be held in order to aid and subserve the purposes of the incorporation, as long as the body politic remains in existence ; and on failure of successors, or on dissolution of the corporation, from any other cause, the lands revert to the donors—again, the lands which any civil corporation of a public nature holds must be considered as being held, not for the fruition of the existing body of corporators for the time being, but as being held to them and their successors, for the purposes of their incorporation. To other purposes, it seems quite contradictory to the fundamental ideas of corporation law to suppose that they can be diverted, which aliening them does. Grant, No. 136.

The difficulty is great, of conceiving how it can be competent for a body with a perpetual succession, to which lands have been granted, in furtherance for ever of certain objects, to the support and maintenance of which in the judgment of the donors the possession of land would be instrumental, to part with that land for the personal benefit of the existing members of the corporation; without any regard to such intentions of the donors, and as it were barring the entail to the successors—with respect to lands bought from corporate funds the same difficulty arises. How is it consonant with the acknowledged principles of the corporation law, that one generation of corporators should have power to devote to their private emoluments, funds that a former generation has invested agreeably to the purposes of the institution. Grant, No. 139.

After having shown that the majority could not erect themselves into a new corporation and make a donation to themselves, through the new corporation, we will now show that the said majority could not destroy and cancel the charter entrusted to their keeping.

Chancellor Dessaussure in his opinion to be found in the 3d vol. of Dessaussure, South Carolina Reports, *Smith* v. *Smith*, p. 557, has treated this point and some other points of this case in such a masterly manner that the best argument that can be made in this case is the reproduction of some extracts of this celebrated case, which is referred to in Kent's Commentaries, Angel and Ames, and all the writers on corporation law. Mr. Dessaussure says :

" One of the fundamental rules of corporate bodies is, that the members are not to do any act which may destroy its existence or injure its privileges."

" If any members do any such acts as are detrimental to the corporation itself, or to some of its liberties, privileges or franchises ; such as burning or erasing the records, attempts to destroy the charter, etc., they are subject to be removed for such acts, etc."

In the time of Charles II, when a profligate and tyrannical government found it necessary to vacate the corporations in England in order to mould them to its purposes, bold and cunning attempts were made on the officers of London and most of the corporations in England ; many of them were surrendered by the pusillanimity of the officers, and that of London was declared to be forfeited, with

some others who would not voluntarily surrender the charters; the arguments against the validity of the voluntary surrender by the officers, appear to be very powerful. It was said that those who were in the government of corporations, and had their charters *and seals in keeping, were not the masters or proprietors of those rights ; they could not extinguish those corporations nor part with any of their privileges; the charters were sacred trusts, which could not be given up at the will of the officers,* who only had a temporary administration, not a property in the charter ; nay, that crimes committed by corporation officers were personal things which were only chargeable on those who committed them, but could not affect the whole body.

" These arguments had no effect at the time when a wicked government and dependent judiciary decided arbitrarily, for at that time the judges held their commissions at the pleasure of the crown and were miserably submissive to its dictates, as the least resistance produced a dismission ; but afterwards, at the revolution, parliament and the Court acknowledged these principles and reasonings to be valid, declared the surrenders and the judgments of forfeiture to be void, and the charters were all restored and new sanctions enacted to guard them from future surrender. See Burnett's History of his Own Times, and Bac. 31-2.—To apply them to the present case :

" The officers and members of the Grand Lodge agreed to surrender or abandon their charter and to accept a new charter, &c. They formed themselves into a new voluntary association with a new name, and actually carried their plan into effect as far as in them lay, and declared the ancient system abolished and extinguished, &c. Upon the best consideration I have been able to give this question, it does seem to me, that these acts done by the Grand Lodge were inconsistent with the chartered rights of the society and with the law of the land respecting corporations.

" The officers of a corporation, or an integral portion of it, are not the corporation. They have no right to make the surrender, and if they make the attempt, by an act or declaration, it is an inefficient act, it is not obligatory on the corporation, which retains its full rights, existence and legal character.

" With respect to the individuals composing the Grand Lodge, who acted the part complained of, it appears to me that they made so complete an abandonment of the society, such a resignation of their interest in the charter, that there was no necessity for their removal by any act of expulsion or a motion, &c.

" I think the acts of the members composing the Grand Lodge, in declaring the Grand Lodge dissolved, do amount to an express declaration that they would serve no longer, and is a voluntary and avowed abandonment of the charter of the society. It was not a loose declaration, but a solemn act, published to the world and since avowed to the court, and they are bound by it.

" Their very suit, in a different character, proves this.

" It is not easy for a corporation to be connected and succeed to the rights of a voluntary society out of which it grew, and still less, I apprehend, can the individuals who belonged to the corporation and even composed an integral part of it, but who have abandoned the society to form a new voluntary society, connect the rights of the old corporation with the new society." (Judgment of Henry William Dessaussure, *Smith et als.*, v. *Smith et als.*, Dessaussure, Ch. Rep., vol. 3, page 557.)

Besides, the cancelment of the charter and the dissolution of the corporation would cause the disfranchisement of the dissenting corporators.

9

P. Star Lodge
v.
P. Star Lodge.

And the majority is without power to disfranchise any corporator, or to force a new charter on any body of persons who do not chose to accept it.

See the following authorities :

" Disfranchisement is defined to be the taking a franchise from a man, for some reasonable cause, and no cause is reasonable, unless it be just and legal. Therefore, no corporator, who has a *freehold* in his franchise, that is, who is elected for life, or upon such terms as are construed to amount to a life interest, can be disfranchised at the mere will and pleasure of the corporation." Grant, No. 264.

" Nor can a charter be forced on any body of persons who do not chose to accept it. Grant, No. 13.

We now come to the 3d question :

Is the act of incorporation of the 14th January, 1858, valid? Was the corporation fully organized and capable of receiving and accepting the donation of the 16th January, 1858, and does the act of donation create a trust for purposes foreign to the institution of the said corporation.

The defendant has no legal existence, and its creation was not authorized by any law ; the law of 14th March, 1855, under which it claims to exist, provides only for the " Organization of corporations for literary, scientific, religious and charitable purposes."

And corporations organized for such purposes are alone recognized and clothed with the privileges enumerated in the said law ; among others, to hold real estate.

The act of incorporation of the 14th January, 1858, says, that " *They erect themselves into a corporation for their own use and convenience and that of their successors ; and Art. 2 says, that the purposes and object of said corporation are to cultivate among themselves good will and faith, to relieve each other when in distress, and to extend charity among themselves and to the widows and orphans of the society.* The purposes of this incorporation are *not charitable purposes.*

" The legal definition of charity with reference to the statute of charitable uses, 43 Elizabeth C. 5, *is a gift to a general public use which extends to the rich as well as to the poor.* Grant, No. 116.

It follows from this definition of charity and charitable uses, that the defendants were incorporated in violation of a statute which, by providing for the organization of certain corporations for certain specified purposes, impliedly prohibits the organization of corporations for other uses and purposes than those specified. *Inclusio unius, exclusio alterius.*

The defendants being an unauthorized corporation can not hold land in their corporate capacity ; and, therefore, no estate has passed to them from the grantor. See Art. 437, Art. 12 and Art. 19.

We have already seen, that the incorporation of the 14th January, 1858, was the act of the majority of the members of the corporation of Polar Star Lodge No. 1, and that their act was an absolute nullity, because it was made without authority, and because it was foreign and contrary to the purposes of their charter of incorporation; a void act can produce no effect, *quod nullum est nullum producit effectum*; the incorporation of the 14th January was, therefore, null and void.

Besides, on the 16th January, 1858, at the date of the donation, this new corporation was not a *person able to sue, or to make a continual claim, or able to make any corporate act ; in fact, there was a vacancy in the headship,* which suspended

the functions of the life of the corporation, and prevented them from acquiring any property.

The defendants were organized and created a corporation under the act entitled "An Act for the organization of corporations for literary, scientific, religious and charitable purposes," approved March 14th, 1855. See Session Acts of 1855, p. 185 ; Revised Statutes, p. 112.

This Act, among other obligations imposed upon the corporators, compels them to specify in the charter of incorporation the *place chosen for its domicil*, the manner in which the managers and officers are to be chosen ; *the officer on whom citation may be served, &c.*—We respectfully submit, that under this statute the corporation, the metaphysical and intellectual being, cannot acquire any legal personality or existence before the appointment of *its head*, the officer upon whom the *process of citation may be served.*

In order to be capable of acquiring property by act *inter vivos*, the Art. 1469 C. C. requires that the donee should be existing at the time of the donation, and Art. 1459 requires that the donee should be capable of receiving at the date of the acceptation of the donation, and Art. 1536, of the Civil Code, provides that donations made for the benefit of an hospital of the poor, of a community, or of an establishment of public utility, shall be accepted by the administrators of such communities or establishments.

Referring to the act of donation of the 16th January, 1858, we read :

" Par devant *Joseph Lisbony*, notaire, &c., fut présent *Romain Brugier, &c.* Lequel comparant, agissant comme il est dit ci-dessus, et en vertu desdites résolutions, déclare faire donation entre vifs *pure et irrévocable*, à la corporation établie en cette ville, sous le nom de ' Loge de l'Etoile Polaire Numéro Un,' en vertu d'un acte en date du 9 Janvier, 1858, approuvé par *M. A. Foute*, avocat de District, le 14 Janvier, 1858, et enrégistré au bureau des hypothèques, en cette ville, au livre des Sociétés No. 4, page 104, ladite corporation ici *représentée par un comité d'organisation composé de messieurs Nicolas Colin, Jean Lasalle et Louis Gloeckner, tous trois* ici présents, et acceptant pour ladite corporation, en vertu de l'article 7 dudit acte d'incorporation."

The Art. 5th of the act of incorporation of the 14th January, says : "The president of said corporation shall *alone* represent it in its outdoor and public affairs, receive all citations and demands, relative to its interests, defend it in all actions and suits brought against it, and bring in its name all actions and suits which it may have to bring ; and Art. 3 of the same act says: The *president and officers* of the said corporation shall be elected by *a majority of its members*, present at a meeting called to that effect at the time, to be specified and fixed by the regulations or by-laws of said corporation.

On the 16th January, 1858, at the date of the donation, the president and other officers of the corporation had not been elected, and assumed their functions ; the by-laws had not been adopted.

Referring to the book R., which the defendants have introduced in evidence as their minutes, we see that their president and officers had only been elected on the 8th February, 1858.

It is a well settled principle, that a corporation cannot make any corporate act without a president, syndic or administrator who has a legal mandate to represent the corporation, and that in the absence of these officers, the corporation is suspended and can acquire no right.

Art. 429 C.C. says : " From the circumstance that a corporation is an intel-

P Star Lodge
v.
P. Star Lodge.

lectual being, it follows that they cannot personally transact all that they have a right legally to do, as has been above observed ; wherefore it becomes *necessary* for every corporation to appoint some of their members, to whom they entrust the direction and care of their affairs, under the name of mayor, president, syndics, directors or others, according to the statutes and qualities of such corporations."

" Les communes, les établissemens publics, les corporations, êtres moraux et fictifs, *sans organes et sans activité*, n'ont à proprement parler ni capacité ni incapacité. .—Il y a, en effet, plus qu'une *incapacité*, puisqu'il y a pour eux impossibilité de contracter par eux-mêmes.—Leur incapacité n'est que celle de leurs administrateurs et représentants, et si ces hommes sont incapables, ce n'est pas qu'ils soient dépourvus de raison, mais la loi, ainsi que nous l'avons déjà dit, a fait les conditions et tracé les limites de leur pouvoir, dans l'intérêt des corps qu'ils représentent et administrent. Lors donc que l'on dit de leurs actes qu'il y a vice d'incapacité, on devrait plutôt dire qu'il y a défaut ou excès de pouvoir. Or, nous avons déjà dit que ce vice se confondait avec un vice de l'objet du contrat, le vice de son indisponibilité quant aux contractants."—Larombière, Théorie et Pratique des Obligations, Vol. 1, p. 162, No. 6.

In the Roman law, a corporation *Universitas sive Collegium*, could only act by its agent, or syndic, *actor*, or procurator. See Pothier, Pandectes, Book 3, p. tit. IV, p. 107, et seq.

Cujas says that municipalities could not sue or be sued, or make any claim by themselves, but they must appoint their sydic or *actor* to represent them.

*Universi agere non possunt, vel actiones excipere, etc. Sed municipes ad eas actiones admittuntur, itá tamen ut ei municipes quibus restituitur hereditas, actorem eligant et constitutant sive syndicum ad agendum et ad excipiendas actiones hereditorias.* Cujas ad S. C. Trebell, in lib. XL digestorum Salvia. Julian, op. post. vol. II, p. 303.

We find the same principles adopted by the English writers on corporation law.

A devise of lands in remainder to a corporation not *in esse* at the time of the devisor's death is bad, although such a corporation is erected before the *remainder falls.* Grant, No. 51.

But where the corporation has a head, a grant to them must not be made during the vacancy of the head; thus in the cases of mayor and burgesses, dean and chapter, and other like bodies, all grants made during the vacancy of the head are void, for the corporation in the interval between the death or resignation, or deprivation of the head and the appointment of the succession, has no power *to exercise any corporate* function, except to proceed to elect or admit the new head, &c. The consequence is, that the *grant must be construed to be wholly null and void, and no estate whatever to have passed out of the grantor.* Grant, No. 110.

The corporation of the college or hospital must be capable of all its functions, and not suspended at the death of the testator, otherwise the devise will be void, because the body designated in the will is not in full life when the will takes effect ;—therefore the head of the college cannot devise to the college, which at his death is in a suspended state and capable of no corporate act except electing his successor. *It is not a person able to sue or to make a continual claim.* Grant, Nos. 123, 146.

There is still another ground of nullity in the defendant's title : it is asserted

in the defendant's answer that they constitute a masonic corporation and hold the land for masonic purposes. This assertion is contrary to their act of incorporation of the 14th January, 1858. It is said in their charter that they erect themselves *into a corporation for their own use and convenience and that of their successors, and that the purposes and object of said corporation are to cultivate among themselves good will and faith, to relieve each other when in distress, and to extend charity among themselves and to the widows and orpdans of the society.*

If the defendants are held bound by their pleadings, it is clear that they hold the land for purposes foreign to their incorporation, and, therefore, the act of donation is null, and did not transfer any ownership to them.

A corporation, says Kent, cannot be seized of land for purposes foreign to its institution. Kent's Commentaries, vol. II, p. 328.

4th question. Can the majority of the corporation secede, and what is the effect of their secession, as regards the remaining members and the rights and property of the corporation.

There is no doubt that any corporator may resign either an office in the corporation or his character and privileges as a corporator. Grant, No. 265 ; Blackstone, vol. 1, Nó. 484.

The resignation may be express or implied ; for instance : accepting another office incompatible with the other implies a resignation. 3 Bur., 1615.

In the present case, the acts of the members declaring the lodge dissolved and canceling its charter *amount to an express declaration, that they would serve no longer, and is a voluntary abandonment of the charter of the society ; it was not a loose declaration, but a solemn act published to the world, and since avowed to the court, and they are bound by it.*

*This very suit, in which they appear in a different character, proves this. Smith* v. *Smith,* 3 Dessaussure, S. C. R., 557.

There was therefore no necessity for their removal by any act of expulsion or a motion.

"To burn or erase the charters, or to falsify or erase the books, are breaches of duty which amount to a forfeiture of the corporate character, for these are acts which tend in the highest degree to the detriment of the corporation." Grant, No. 265.

They have, therefore, voluntarily resigned, and must be considered as having ceased to be members of the corporation.

They were corporators under the charter of incorporation granted by the Grand Lodge ; as such, they were members of the society of Masons, and were bound by their obligations to the Grand Lodge and to the other societies of Masons, they could not dissolve the corporation without the assent of the great body of the society. *Smith* v. *Smith,* 3 Dessaussure, S. C. R. 557.

They were a constituent part of the Grand Lodge, which is constituted by the meeting of subordinate lodges. Principles of Masonic Law, p. 22.

By the terms of their charter and masonic usages they were subject to the executive, judicial and visitorial power of the grand Grand Lodge ; in short, "A Grand Lodge is the supreme legislative, judicial and executive authority of the masonic jurisdiction in which it is situated, it is, to use a feudal term, the ' Lord paramount' in Masonry. It is a representative lodge in which, however, its constituents have delegated every thing and reserved no rights to themselves. Its

authority is almost unlimited, for it is restrained by but a single check. *It cannot alter or remove the ancient landmarks.*" A. G. Mackey, Principles of Masonic Law, p. 72.

These were the obligations to which the members of the Polar Star Lodge voluntarily submitted themselves by becoming members of the corporation.

*Contractus sunt ab initio voluntatis ; ex post facto necessitatis.*

They could not disregard their obligations, they could only resign, and this they have done ; but their resignation did not impair or affect the franchises of the remaining members, the corporation always existed unimpaired, and the rights vested in the metaphysical being and the intellectual entity, which is the corporation, remain unimpaired.

" No man can be compelled to continue his union with a society, whether it be religious, political or social, any longer than will suit his own inclination or sense of duty.  To interfere with this inalienable prerogative of a freeman would be an infringement on private rights.  A mason's initiation is voluntary and his continuance in the order must be equally so." A. G. Mackey, Principles of Masonic Law, p. 286.

A corporation, says Kent, possesses a strong and tenacious principle of vitality." Kent Com. v. 378.

It is true that by the withdrawal of the seceding members the corporation lost some of its officers, but this loss, instead of attacking its vital parts, operated like a pruning knife, it was an amputation that gave a new life and increased the vitality of the body politic.

One single remaining member would have preserved the life of the corporation.

" *In decurionibus, vel aliis universitatibus, nihil refert utrum omnes iidem maneant, an pars maneat, vel omnes immutati sunt.*

" *Sed si universitas ad unum redit, magis admittitur, posse eum convenire et conveniri, cum jus omnium in unum reciderit, et stet nomen universitatis.*" Pothier, Pandectes, vol. 3, p. 108, Nos. 3 and 4.

*Neratius Priscus tres facere existimat Collegium : et hoc magis sequendum est.* Pothier, id. v. 3, p. 109.

The Acts of 1816 and 1819, granting to the Grand Lodge the power of creating subordinate lodges, which are bodies politic and corporate, do not fix the number of persons necessary to form such corporate bodies ; after the withdrawal of the members there still remained more members than were necessary for the practical organization and working of any masonic corporation, or any other corporations known to our law.

" As long, however, as the remaining corporators are sufficient in number to continue the succession, the body remains as though all the monks of an abbey died, yet if the abbot was alive, the corporation was not determined, since the abbot might profess others." Angel & Ames, No. 768.

" Wherever the corporation may restore itself by a new election, though until the new election the rights of the corporators may be suspended, yet they are not extinguished." Angel & Ames, No. 770.

" Chief Justice Rolle says, if the king made a corporation consisting of twelve men, to continue for ever in succession, and when one of them dies, that the rest may elect another in his place, though three or four of them die, yet all acts done by the remaining members are valid, because the members deceased did not constitute a distinct integral part." Angel & Ames, No. 770.

"The corporation exists *per se* so far as is requisite to the maintenance of perpetual succession and the holding and preserving of its franchises; the non-existence of the managers does not suppose the non-existence of the corporation : the latter may be dormant, its functions may be suspended, for want of the means of action, but the capacity to restore its functionaries, by means of new elections, may remain. There is no reason why the power of action may not be revived by a new election of the managers and officers, competent to carry on the affairs of the corporation conformably to the direction of its charter." Angel & Ames, No. 271.

After the withdrawal, the corporation proceeded to the new election of its officers and resumed its proceedings.

.The withdrawal of the members could not affect the rights of action and the property of the corporation.

The following principles are now the settled jurisprudence of England and the United States of America, on corporation law :

"Where a majority of the members of a congregational church separate from the majority of the parish, the members who remain, although a minority, consti-tute the church in such a parish, and retain the *rights* and *property* belonging thereto." 16 Massachussetts Rep., *Baker et als.* v. *Fales*, p. 487.

"If any portion of the members of a corporation secede, and are even erected into a new corporation, the corporate property will not be *transferred or distrib-uted* in consequence of the separation, but will remain with the old corporation." Angel & Ames, No. 194, and the following authorities cited :

*Dartmouth College* v. *Woodward*, 4 Wheaton U. S. R. 518 ; *Brown* v. *Porter*, 10 Mass. R, 93; *Baker et als.* v. *Fales*, 16 Mass. R. 488; *North Hempstead* v. *Hempstead*, 2 Wendell N. Y. R. 135, *per* Savage, Chief Judge ; *The Inhabitants of Harrison* v. *the Inhabitants of Brighton*, 16 Mass R. 16 ; *Inhabitants of County of Hampshire* v. *Inhabitants of County of Franklin*, 16 Mass. R. 76 ; *Presbyterian Church* v. *Dannon*, 1 Dessauss. S. C. Ch. R. 154 ; *Smith* v. *Smith*, 3 Dess. S. C. Chan. R. 557 ; *Harmon et als.* v. *Dreher et als.*, 1 Speers S. C. Eq. R. 87 ; *Associ-ate reformed Church* v. *Theological Seminary of Princeton*, 3 Green N. J. Ch. R. 77 ; *Gable* v. *Miller*, 10 Page N. Y. R. 627 ; *Camayer* v. *United German Luther-an Churches*, 2 Sanford N. Y. Ch. R, 186.

Indeed, the rights and property of a corporation are not vested in its mem-bers.

"The corporation is a metaphysical being not identical with the majority, or even the aggregate of its members at any *given time*, but consisting of them, their predecessors and successors, and has rights altogether distinct and separate from those of all or each of such majority or aggregate body." Grant, No. 72.

The Art. 426, C. C., says, "Corporations are intellectual beings, different and distinct from all the persons who compose them."

And Art. 427, "The estate and rights of a corporation belong so completely to the body, that none of the individuals who compose it can dispose of any part of them." See also Pothier, Pandects, vol. 3, p. 108.

It is therefore clear, that the members of a corporation, having no interest in the rights and property belonging to the body, they can in no manner impair, dispose of, or destroy these rights.

The doc. K, Rec. p. 74 to 83, which is the title of the Polar Star Lodge No. One, positively puts the property of the lodge out of the reach of any members of the corporations.

P. STAR LODGE
        v.
P STAR LODGE'

"*Il est expressément entendu et convenu, que cette donation étant faite à une so-
ciété, loge ou corporation maçonnique, lesdits donataires n'acquèreront aucun titre
en propre auxdites propriétés.*"

This attempt to dispose of the property of the lodge, by the seceding members,
is clearly proved to be condemned by the writers on corporation laws, our own
Civil Code, and the very title of the corporation to its property.

It will be for the court to teach these defendants that our laws afford a remedy
for every wrong, and that a corporation "may sue, to set aside transactions, fraud-
ulent against it, although carried into effect in its name by members of the
governing body," Grant, No. 199 ; and that trust moneys and trust property
may be pursued in the hands of any person receiving them without consideration
and with notice of the trust, Kent, vol. II, 280.

The plaintiffs respectfully pray, that the judgment of the inferior court be re-
versed, and that the judgment of this court be rendered in their favor, according
to the prayer of their petition.

                            Respectfully submitted,
                                    J. L. TISSOT,
                                  , J. Q. A. FELLOWS,
                                    E. FILLEUL,
                                                    *Of Counsel.*

                        PETITION FOR A RE-HEARING.

The counsel for defendant argue as follows :

The defendant and appellee respectfully pray for a rehearing of this cause, for
and upon the following considerations, viz :

1. The Supreme Court says that the right of the plaintiff to stand in judgment
*for want of a resolution of the* corporation authorizing the suit " *should have been
pleaded in limine litis.*"

Now this is correct in principle, but not in fact.

True it is no separate plea was made, but the denial of authority—the denial of
the right of those who brought the suit—*was set up in the answer ;* and no objec-
tion was made to its being tried with the merits.

It was tried with the merits, and the attorneys for the plaintiff exhibited the
authority under which they brought the suit.    (It is the resolution appointing
*Tissot* and giving him a fee of $3000.)

This question was tried and decided.    It is a material question.

Now this resolution was *not* passed by the corporation ; but by the seven or
eight members who protested and who held meetings outside and among them-
selves, and *with* several others *who were not members* of the corporation, and
without notice to other members.    Their acts were clearly null.    Instead of
bringing suit in their own names against the corporation, citing the president and
officers to compel a meeting, &c., to obtain the nullity of the donation, they voted
themselves to be the sole representatives and brought the suit in the name of the
corporation.    This they had no right to do ; and the question is, whether the
question can be examined in this court.

We say it can, because it is immaterial whether the exception be pleaded sep-
arately and before answering, or not, if indeed it was pleaded and was tried with-
out objection, and if the necessary facts to decide it are in the record.    See 14
Lou. 187-188 ; 1 Rob. 168 ; 7 Lou. 197 ; 19 Lou. 402 ; 6 Rob. 13 ; 12 Lou. 9 ;
13 Lou. 160-169.

See as to effect of judgment by default, *Magee* v. *Dunbar*, 10 Lou. 550 ; *French*  <span style="float:right">P. STAR LODGE<br>*v.*<br>P. STAR LODGE.</span>
v. *Putnam*, 14 Lou. 97 ; *Wilcox* v. *Huie*, 18 Lou. 426.

II. The court has erroneously confounded the nature of this case with that of *Knabe* v. *Ternot*. The reasoning of the court is upon the assumption that the facts in the two cases are similar in substance.

They are not so. In fact they are precisely the *reverse* of each other.

In *Knabe* v. *Ternot* one party attempted to exclude the minority from the franchises of the corporation and to appropriate the property so as to prevent the minority from their rightful share in its enjoyment.

In this case, on the contrary, the majority procured the new charter for the lodge, for the whole lodge and all its members. Not for themselves alone. This is clearly shown by the resolutions adopted by the lodge, accepting the charter and making it its own. They wished to procure a new charter which would be that of the lodge, independently of the Grand Lodge. That was all. They did not attempt to exclude any member, or to take away any franchise. They did not pretend to give it any other effect than that of *preserving* and *perpetuating* the lodge intact, and preventing its dissolution in case of a withdrawal from the Grand Lodge's jurisdiction. They thought that a dissolution would follow a withdrawal from the Grand Lodge, and their only object was to guard against this effect, so as to be able to maintain their corporate life.

Nowhere does it appear that they disputed the right of the minority to any franchise whatever. Nowhere does it appear that the minority was excluded from meetings, or from access to the hall, or from ceremonies, etc. On the contrary, they were constantly invited to continue to participate. They voluntarily withdrew.

Similar transformations of the lodge had taken place before. It was the procuring of a new charter for the lodge, the whole lodge and nothing but the lodge, nothing more or less than the whole lodge, which was attempted. It was not an attempt to exclude any member, as in the case of *Knabe;* and therefore the reasoning and principles applicable in that case, do not apply to this ; but the reverse.

III. The lodge *itself* accepted the new charter *as its own* by resolution, and cannot complain of its own act. The individual members might do it by an action brought in their own name against the lodge. But the *lodge* as a corporation *or person* cannot be heard to complain of *its own proceedings* and *resolutions*. If it did not like them it could repeal them. The same remark as to the donation. The lodge never repealed its action with regard to it, or authorized it to be disturbed.

The resolutions of the lodge itself are *at war* with this suit to annul the donation. If we did not know all about it, if the records of *the* lodge were not *all* before the Court, we might *imagine* that there was some action of the lodge receding from the donation. But we know when, where and how this suit has been brought *in the name* of the lodge. It was at the instance of the minority meeting, and meeting with others not members, outside and separately, and without notice to the other members. So that to annul the donation is to decree a judgment in favor of the lodge *against the expressed will of the lodge*. The will of the lodge, its desire to recede from the donation, to have it annulled, could be expressed in only one way, by a resolution adopted by a majority at a duly called meeting. (Art. 435 Civil Code.) In the absence of such action the presumption is, that the resolutions of *the lodge*, as expressed by the resolutions in the record,

are still in force ; and therefore a judgment annulling the donation is a judgment in favor of the lodge against *the will*, the past, continued, and present will of the lodge. In fact we know it is proved, it is shown by the record, by the minutes of the lodge, that the lodge is not asking and do not require the annulment, that the use of its name is a subterfuge, used *against* itself. Ignorance of the fact cannot be argued ; the whole and the real state of the case is before the Court. In fact the Court knows and the Court takes as the basis of the argument, that it is called upon to redress the wrongs done *the minority*. Now, how can it be assumed that the minority are representing *the* lodge, against the action of the majority as expressed *by resolutions of the lodge ?* The whole proceeding is a contradiction of itself and ought to be dismissed. Let the minority, if they have a good cause of action, sue the lodge to force it to annul the donation, as it was done in the case of *Knabe* v. *Ternot* quoted by the Court.

A corporation expresses its will by resolutions ; by these resolutions we know the will of the lodge, and as long as there is a will so expressed, all action of the officers or members, or agents, or attorneys, contrary to those resolutions are *their* individual acts, and not the acts of the corporation, and are against the corporation. If for instance even the Attorney of the city of New Orleans were to bring a suit *in the name of the city*, to annul a city ordinance (an existing and unrepealed city ordinance,) would not the mere production of that ordinance be sufficient to defeat the suit. No agent can act independently of the will of his principal. If the will of that principal is contrary to law and to the interests of the agent, the latter may refrain to execute and may even sue the principal; but the idea of taking the principal's name *against* his consent, in order to obtain in that way a judgment really in favor of the agent and against the principal, is a contradiction.

Respectfully submitted,

P. SOULE,
C. DUFOUR,
*Counsel.*

MERRICK, C. J. The present controversy is between two corporations of the same name. The suit is brought to annul a donation made by a majority of the members of Polar Star Lodge No. 1, as it existed under its charter granted by the Grand Lodge of Louisiana in 1855, to the defendant, and to recover back the property. It is made a question whether the plaintiff is the same corporation as that formed in 1855, or whether it is not one having its origin since the act of donation was passed and taking date in 1858 ? It is obvious that this question is vital, and if the plaintiff cannot trace back its origin to a time anterior to the date of the act of donation, that the controversy is ended.

If, on the other hand, the plaintiff is the identical corporation which existed in 1855, then as the defendant claims title through the plaintiff, the only remaining question is whether the act of donation irrevocably transferred the property to the defendant ? And it will be a matter of useless labor to trace back the history of the Masonic body acting under the title and name of Polar Star Lodge No. One to its origin in 1794.

In 1816 the Legislature, by a general law, incorporated the Grand Lodge of Louisiana, and all other lodges under its jurisdiction so long as said lodges should remain under the power and jurisdiction of said Grand Lodge. 2 Martin's Digest, 660.

In 1819 the power was conferred by the Legislature upon the Grand Lodge to create Masonic corporations under its jurisdiction, in these words, viz : "*Be it enacted, &c.*, That all the regular lodges which have been constituted by the Grand Lodge of the State of Louisiana since the passage of the Act to which this is a supplement, (1816) as well as all the regular lodges which shall be hereafter constituted by the same, are hereby declared to be bodies corporate and politic in name and deed, by whatever style or name they may be called and known in their constitution, with equal powers to those given to said Grand Lodge by said act, so long as the said lodges shall remain under the power and jurisdiction of said Grand Lodge, and in all things abide and conform themselves to the resolutions and by-laws of the same, and no longer." Acts 1819, p. 16.

In February, 1855, the Grand Lodge granted a charter to the Polar Star Lodge No. 1. This lodge, being the only Masonic body of that name, continued to act under the jurisdiction of the Grand Lodge until 1858.

At this time, viz : January 9th, 1858, twenty-two out of the forty-four remaining members of the corporation, with one other person, formed, under the general laws of the State, another corporation of the same name, viz : Polar Star Lodge No. One. After the formation of the new corporation, a meeting was called of the members of the old corporation, at which were present seventeen members of the new corporation and four of those still attached to the old lodge, and by the votes of the former against the protests of the latter, it was resolved to donate the property of the old corporation to the new one. An act of donation was executed in conformity to the resolution. Afterwards, at another meeting, substantially the same members passed a resolution withdrawing themselves from the jurisdiction of the Grand Lodge of Louisiana. They directed the Secretary to inform the Grand Lodge officially of their resolution. He surrendered to the Grand Lodge the original charter after having written these words across its face, viz : " This charter has been cancelled and surrendered according to the resolution by which the M∴ W∴ Lodge, Polar Star No. 1, withdraws itself from the jurisdiction of the Grand Lodge of the State of Louisiana. New Orleans, Feb. 16, 1858. L. Gloeckner, Secretary."

The remaining members of the old corporation present protested and denied that the corporation was dissolved. They, with four others, eight in all, also applied to the Grand Lodge for a duplicate or exemplification of their charter, and protesting against the act of the majority, denied that it could have the effect of extinguishing their charter.

The Grand Lodge passed the following resolution on the 9th of Feb., 1858.

" *Resolved*, That the charter of Polar Star Lodge No. 1 be entrusted to brothers P. Devergès, M. Meilleur, J. L. Tissot, Charles Claiborne, F. Levasseur, O. Schwaner, A. Texier and F. A. Lumsden, and such other members of Polar Star Lodge No. 1 not otherwise named in the foregoing report, who shall give their allegiance to the Grand Lodge and who shall be received by the said eight brethren first named with power at once to proceed to organize their Lodge by the election and installment of officers ; and in default of obtaining the charter of said Lodge for said purpose, this resolution shall be their warrant until such time as a regular charter can be furnished them."

The District Judge was of the opinion that the resolution was the creation of a new charter, and that the very act of withdrawing from the Grand Lodge was, by the terms of the law, an extinction of the charter of 1855.

But it is manifest that the question, when pursued further, resolves itself into

this : had the majority the right to dissolve the corporation to the prejudice of the minority, by voting to withdraw from the jurisdiction of the Grand Lodge, and can a Masonic corporation be dissolved without the action of the public authorities, or at least of the Grand Lodge ? For the destruction or cancellation of the parchment on which the charter is written is not *per se* an annihilation of the corporation.

There is no doubt of the right of individual members to withdraw themselves from the lodge and from the jurisdiction of the Grand Lodge. And doubtless the whole of the members might do the same thing by their unanimous resolution. But so long as a sufficient number of members to represent and continue the corporation exists, it does not appear to us to be within the power of the majority to dissolve the corporation. They may dissolve their own connection with it, but they cannot prejudice the vested rights of their co-corporators by any act foreign to the objects of the corporation.

As a general rule, the question as to the forfeiture or dissolution of charters and acts of incorporation is one which concerns the public order, and the corporation is presumed to exist for all purposes of justice until the forfeiture is declared by the judgment of the courts in some proceeding in which the State is a party. No provision has been made which we recollect for the surrender of charters except those in 1842 in relation to banks. Whether the Grand Lodge has the power to declare the forfeiture of Masonic charters granted by itself, or to receive the surrender of the same, it is not now necessary to determine ; for it does not appear it has accepted the surrender of the charter of 1855, nor declared the forfeiture of the same.

It must, therefore, be assumed that it still exists.

It is then contended that it exists, if at all, with its old officers and members, and in substance, that the proceedings under the resolution of the Grand Lodge are irregular.

To this it may be replied, that this suit has been brought by attorneys-at-law representing the original Polar Star Lodge No. 1, and the position now assumed is somewhat inconsistent with the defense, which is based on the supposition that the corporators forming the new Polar Star Lodge No. 1 have dissolved the old lodge as a consequence of their withdrawal from the jurisdiction of the Grand Lodge. If they affirm it to be dissolved, they virtually deny that they are corporators in it.

At all events, the question goes to the right of the plaintiff to stand in judgment, for want of a resolution of the corporation authorizing the suit. This is a dilatory plea, which implies no want of absolute right in the corporation itself, and, therefore, should have been pleaded *a limine litis*.

The defendant, as already said, claims title to the property in dispute, through the plaintiff, and if it recovers at all, it must be by virtue of the donation passed before Joseph Lisbony, the 16th of January, 1858.

This donation was made (it has already been shown) in virtue of a resolution passed by the votes of the members of the defendant corporation acting also as members of the Polar Star Lodge, No. 1, under its charter of 1855, and against the protest of such of the remaining members as were present at that meeting.

The effect of a lease made in this manner was recently considered by us in the case of *Knabe* v. *Ternot et al.*, and we then held that the adverse interest of the corporators disqualified them from leasing the property to the new corporation in which they were interested, if done against the wishes of the remaining cor-

porators, and that such lease was violable. Were any other doctrine law, in our <span style="float:right">P. Star Lodge<br>v.<br>P. Star Lodge.</span> State, where corporations are so easily organized, a majority of the new corporation might form a third corporation and the property might be in the same manner transferred to the latter, and then again to a fourth, and so on, and thus a large corporation aggregate might find its property in the hands and enjoyment of the few, and perverted to uses never intended by the founders of the original corporation.

Under the authority of the case of *Knabe* v. *Ternot, et al.*, the donation must be declared void.

On the question of revenues the testimony is conflicting. Plaintiff's witnesses testify what rent *might* be raised from the property. Defendant's witnesses testify what the rent would be if the hall were occupied for the purposes for which designed, and we shall adopt the highest estimate of these witnesses.

The proof is also unsatisfactory as to what particular personal effects belonged to the plaintiff and were transferred by said act of donation. We shall remand the case, in order that proof may be adduced on this head, and also of the value of any articles which may have been disposed of or destroyed by the new corporation.

It is, therefore, ordered, adjudged and decreed by the Court, that the judgment of the lower court be avoided and reversed, and that the said resolution of the 14th day of January, A. D., 1858, and the said donation passed before Joseph Lisbony, on the 16th day of January of the same year, A. D. 1858, be declared null and void; and it is further ordered, adjudged and decreed, that the plaintiff do recover and have judgment against the defendant for the property and possession of the real estate described in the plaintiff's petition, and situated in the square bounded by Love, St. Claude, Esplanade and History or Annette streets in the city of New Orleans, and that the plaintiff do recover and have judgment against said defendant for rent at the rate of six hundred dollars per annum, from the sixteenth day of January, 1858, until said property be surrendered to the plaintiff for the use of the same, and the movables mentioned in said act of donation; and it is further ordered, that this case be remanded to the lower court, to inquire what movables were included in the act of donation passed before said Joseph Lisbony, and to render judgment for the same, including the value of such as may have been disposed of or destroyed, if such there be; and it is further ordered, that the defendant pay the costs of the apppeal.